1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FELIPE POLANCO DIAZ, | No. C 10-5298 PJH (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY** |
| vs. | |
| M. MARTEL, Warden, | |
| Respondent. | |
| _____/ | |

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner responded with a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

On April 25, 2008, a jury found petitioner guilty of first-degree murder, *see* Cal. Penal Code § 187, and found true the allegation that he intentionally discharged a firearm, *see* Cal. Penal Code § 12022.53. Respondent's Exhibit ("Resp. Exh.") A2 at 443-44, 527. On June 20, 2008, the court sentenced petitioner to a total term of 50 years to life in prison, consisting of an indeterminate term of 25 years to life for the murder conviction, followed by a consecutive term of 25 years to life for the gun enhancement. Resp. Exh. A2 at 564-66. On December 8, 2009, the California Court of Appeal affirmed the judgment. Resp. Exh. B. A petition for review was summarily denied by the California Supreme Court on March 18, 2010. Resp. Exh. C. Petitioner did not seek further review in the state courts.

United States District Court
For the Northern District of California

1  The facts of the crime, as described by the California Court of Appeal, can be

2  summarized as follows:  Hilda Pacheco was bartending at Tango's Cantina on the night of

3  November 12, 2005, and served Rafael Cruz, a regular customer, two beers between 7

4  p.m. and 8 p.m.  Resp. Exh. B at 2.  Violeta Valadez, an owner of Tango's, also served

5  Cruz about two beers, and sold him a bucket of small Corona beers.  *Id.*  Mary, a

6  bartender, was not working that night but came in as a customer, and sat and talked with

7  Cruz for about an hour, and later danced with him.  *Id.*

8  According to Valadez, Diaz arrived at the Cantina around 9 p.m. and socialized with

9  everyone.  *Id.*  He ordered between nine and eleven beers, some for himself and some for

10  others.  *Id.*  At some point that evening he danced with Mery (not to be confused with

11  Mary), a bartender who was working that night.  Diaz and Cruz sat at a table together,

12  drinking beer, talking, and buying each other drinks, and their conversation appeared to be

13  normal.  *Id.* at 2-3.  *Id.*  At around 10 p.m. both men left the bar, but came back a short

14  while later.  *Id.* at 2-3.  Around twenty minutes later, several patrons heard gunshots from

15  outside the bar, and Cruz was seen falling backwards through the door into the bar.  *Id.* at

16  3.  There was only one witness to the shooting, Apolinar Olivera.  *Id.* at 4.  Olivera was

17  parking his car when he saw two people arguing on the sidewalk.  *Id.*  As he stepped into

18  the bar, he heard the men running behind him, and one of them said "help me" in Spanish

19  prior to being shot in front of the entrance to the bar.  *Id.*  The other man said, "I'm going to

20  kill you, son of a bitch, there's no one here to help you."  *Id.*  Another witness heard the

21  same thing before seeing the victim fall backwards into the bar.  *Id.* at 3.  Olivera held the

22  door as the victim fell from the first gunshot, then heard another gunshot, followed by more

23  gunshots, as the victim was lying face up in the doorway.  *Id.* at 4.  The police arrived

24  approximately five minutes after the last shots were fired.  *Id.*  Investigating officers

25  recovered one spent bullet from inside the front door of the Cantina and two bullet

26  fragments on the sidewalk.  *Id.* at 5.  A black Honda Prelude belonging to Diaz was in the

27  parking lot, registered to him at his mother's address in San Jose.  *Id.*  Olivera was

28  interviewed at the police station and described what he observed that evening.  *Id.* at 4.

United States District Court

For the Northern District of California

The next day officers set up surveillance at Diaz's mother's house, and followed Diaz, three women, and a child when they left the house in a jeep. *Id.* Police followed the car to Fremont where Diaz got out from the passenger side of the car, and then drove to Modesto and parked in front of the police station, at which time he was placed under arrest. *Id.* Police later recovered a revolver, four spent bullet casings, and two live .38 caliber rounds buried about 3.4 miles from the Cantina. *Id.* at 5. After Diaz was arrested, his clothes were photographed and collected and found to have dirt and brown stains on them consistent with blood. *Id.* at 5.

At the time of his death, Cruz's blood alcohol level was 0.26. *Id.* at 1. The autopsy revealed that the cause of death was a gunshot wound of the neck with cervical spine cord contusion. *Id.* at 6. Cruz suffered two gunshot wounds to the neck and had a bullet in his left foot, as well as abrasions on his knuckles and nose. *Id.* at 6-7. Particles associated with gunshot residue were found on Cruz's hand, indicating that he handled or fired a firearm, or was nearby when one was fired. *Id.* at 7. A criminalist later determined that the four cartridge cases were discharged from the revolver that was found by police. *Id.*

The defense called a forensic toxicologist to testify as an expert regarding alcohol and its effects on the human body. *Id.* She testified that even at low levels of blood alcohol concentration, alcohol consumption can loosen inhibitions and impair reasoning and judgment, and that at a level of 0.26, a person's judgment, inhibition, rational thought, and data processing would be seriously affected. *Id.* at 8.

Diaz testified in his own behalf, stating that on the night of the shooting, he drove from his home in Modesto to his mother's house in San Jose with a loaded gun under the front seat, intending to kill himself. *Id.* He passed by Tango's, a place he had been twice before, and decided to stop in and have a beer to relieve his stress. *Id.* He met a woman, Mery, and they conversed, danced to a couple of songs, then sat down and continued their conversation. *Id.* at 8-9. Diaz was approached by Cruz, who appeared to be jealous of the attention that Mery was paying to him, and wanted to know if he was interested in her. *Id.* at 9. The two men argued about Mery throughout the evening until eventually, Cruz bought

United States District Court

For the Northern District of California

1  Diaz a beer, and told him to make it his last.  *Id.*  Cruz then head butted Diaz in the

2  forehead, causing Diaz to get away from Cruz and move to a table.  *Id.*  Nevertheless, Diaz

3  stayed at the bar for another hour because he was talking to Mery, claiming that he didn't

4  want to leave because he was scared.  *Id.*

5       Cruz came to Diaz's table again to talk about Mery, and asked Diaz to go outside,

6  where he told him to leave and threatened to do something to him if he didn't.  *Id.*  Diaz

7  said he would leave, but instead went back in and sat down to finish his beer and say

8  goodbye to people.  *Id.* at 9-10.  Diaz didn't have enough cash to pay his tab, so he went

9  back to his car to see if he could find more money.  *Id.* at 10.  Cruz followed him to his car

10 and slammed the door on his leg.  Diaz felt around his car, grabbed the gun, and tried to hit

11 Cruz on the head with it.  *Id.*  They struggled for the gun, and it landed on the sidewalk.  *Id.*

12 Cruz tried to take the gun but Diaz kicked it away with his leg and told Cruz to get out of

13 there.  *Id.*  Cruz instead went back to the bar.  *Id.*  Diaz picked up the gun and, although he

14 didn't intend to shoot Cruz, pointed the gun at him out of confusion and fear, pulled the

15 trigger and shot him.  *Id.* at 10-11.  As Cruz fell, Diaz fell with him, accidentally pulling the

16 trigger a second time.  *Id.* at 11.  Diaz saw Cruz's body laying on the floor without

17 movement, and began walking away.  *Id.*  Diaz wiped the gun to get rid of the fingerprints,

18 unloaded it, and buried it under a tree.  *Id.*

19      In rebuttal, the prosecution called Mery, who was working as a bartender on the

20 night of the shooting.  *Id.* at 12.  She testified that she spent about ten minutes talking with

21 a man, but that the man did not look like Diaz.  *Id.*  She also stated that she did not talk to

22 Cruz, and that he did not express any romantic interest in her.  *Id.*

23                              **STANDARD OF REVIEW**

24      A district court may not grant a petition challenging a state conviction or sentence on

25 the basis of a claim that was reviewed on the merits in state court unless the state court's

26 adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

27 unreasonable application of, clearly established Federal law, as determined by the

28 Supreme Court of the United States; or (2) resulted in a decision that was based on an

4

United States District Court

For the Northern District of California

1    unreasonable determination of the facts in light of the evidence presented in the State court

2    proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

3    mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09

4    (2000), while the second prong applies to decisions based on factual determinations, *See*

5    *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

6       A state court decision is "contrary to" Supreme Court authority, that is, falls under the

7    first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

8    reached by [the Supreme] Court on a question of law or if the state court decides a case

9    differently than [the Supreme] Court has on a set of materially indistinguishable facts."

10    *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

11    of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

12    identifies the governing legal principle from the Supreme Court's decisions but

13    "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The

14    federal court on habeas review may not issue the writ "simply because that court concludes

15    in its independent judgment that the relevant state-court decision applied clearly

16    established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must

17    be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

18       Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

19    determination will not be overturned on factual grounds unless objectively unreasonable in

20    light of the evidence presented in the state-court proceeding."  *See Miller-El*, 537 U.S. at

21    340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

22       When there is no reasoned opinion from the highest state court to consider the

23    petitioner's claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*,

24    501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.

25    2000).  However, when presented with a state court decision that is unaccompanied by a

26    rationale for its conclusions, a federal court must conduct an independent review of the

27    record to determine whether the state-court decision is objectively unreasonable.  *See*

28    *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  This review is not a "de novo review

United States District Court

For the Northern District of California

1  of the constitutional issue" rather, it is the only way a federal court can determine whether a

2  state-court decision is objectively unreasonable where the state court is silent.  *See Himes*

3  *v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "[W]here a state court's decision is

4  unaccompanied by an explanation, the habeas petitioner's burden still must be met by

5  showing there was no reasonable basis for the state court to deny relief." *See Harrington v.*

6  *Richter*, 131 S. Ct. 770, 784 (2011).

7  **DISCUSSION**

8      As grounds for federal habeas relief, petitioner asserts that: (1) there was insufficient

9  evidence of premeditation and deliberation; (2) the prosecutor committed misconduct by

10 misstating the law during his closing argument; and (3) his due process rights were violated

11 by the trial court's refusal to instruct the jury on the application of voluntary intoxication to

12 heat of passion manslaughter.  Petition for Writ of Habeas Corpus ("Hab. Pet.") at 5-6.

13 **I.  Sufficiency of the Evidence**

14     Petitioner claims that there is insufficient evidence of premeditation or deliberation to

15 support a first-degree murder conviction.  Hab. Pet. at 6.

16     **A.  Legal Standard**

17     In *Jackson v. Virginia*, the Supreme Court established the due process standard by

18 which federal courts review a habeas corpus petition challenging the sufficiency of

19 evidence for a state conviction.  443 U.S. 307, 316 (1979).  Due process requires that "no

20 person shall be made to suffer the onus of a criminal conviction except upon sufficient

21 proof–defined as evidence necessary to convince a trier of fact beyond a reasonable doubt

22 of the existence of every element of the offense." *Id.* at 316.  A state prisoner who alleges

23 that the evidence in support of his state conviction cannot be fairly characterized as

24 sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a

25 federal constitutional claim that, if proven, entitles him to federal habeas relief.  *Id.* at 321,

26 324.

27     A federal court reviewing a state court conviction does not determine whether it is

28 satisfied that the evidence established guilt beyond a reasonable doubt.  *See Payne v.*

United States District Court
For the Northern District of California

*Borg*, 982 F.2d 335, 338 (9th Cir. 1993). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* quoting *Jackson*, 443 U.S. at 319. A court must apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law." *See Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004).

Under the *Jackson* standard, a conviction may be supported by logical inferences from circumstantial evidence, but the inferences cannot be merely speculative. *See Sarausad v. Porter*, 479 F.3d 671, 677 (9th Cir. 2007), *rev'd on other grounds sub nom. Waddington v. Sarausad*, 555 U.S. 179, 182 (2009); *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). Where behavior is consistent with both guilt and innocence, the burden is on the state to produce evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with guilt; however, the "prosecution need not affirmatively rule out every hypothesis except that of guilt." *See Sarausad*, 479 F.3d at 678 (citation omitted).

After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *See Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). The Ninth Circuit has held that section 2254(d)(1) of AEDPA applies to federal review of a state court's sufficiency of the evidence determination under *Jackson*. *Id.* at 1274-75. If the state court affirms a conviction under *Jackson*, the federal court must decide whether the state court's application of *Jackson* was objectively unreasonable. *See Sarausad*, 479 F.3d at 677-78. The Ninth Circuit has adopted guidelines for determining whether a state court applied *Jackson* in an objectively unreasonable manner under section 2254(d)(1), which states as follows:

(1) The focus of the inquiry is on the state court decision;

(2) Even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision;

(3) The failure of the state court to consider at all a key argument of the

United States District Court

For the Northern District of California

defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;

(4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and

(5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness.

*Sarausad*, 479 F. 3d at 678 (citation omitted).

In contrast, section 2254(d)(2) does not apply to *Jackson* cases because the federal court does not decide whether the state court unreasonably determined disputed facts. *Sarausad*, 479 F.3d at 678. Rather, the court must decide whether the state court unreasonably applied the *Jackson* test. *Id.* at 683. Accordingly, a federal court evaluates a challenge to a state conviction on insufficient evidence grounds under section 2254(d)(1) rather than (d)(2). *Id.* at 678.

**B. Discussion**

**(i) California law**

In California, "premeditation" means thought over in advance or considered beforehand, and "deliberation" refers to careful thought and weighing of considerations in forming a course of action. *See People v. Koontz*, 27 Cal. 4th 1041, 1080 (2002); *People v. Mayfield*, 14 Cal. 4th 668, 767 (1997). "The process of premeditation and deliberation does not require any extended period of time....[t]he true test is not the duration of time as much as it is the extent of the reflection....[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly...." *See Koontz,* 27 Cal. 4th at 1080 (quotation and citation omitted). California courts have typically identified three types of evidence that are indicative of premeditation and deliberation: (1) facts about how and what defendant did prior to the actual killing that show the defendant was engaged in activity directed toward, and intended to result in, the killing—may be characterized as planning activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the

8

United States District Court
For the Northern District of California

1   killing was the result of a pre-existing reflection and careful thought and weighing of

2   considerations rather than mere unconsidered or rash impulse hastily executed; (3) facts

3   about the nature of the killing from which the jury could infer that the manner of killing was

4   so particular and exacting that the defendant must have intentionally killed according to a

5   preconceived design to take his victim's life in a particular way for a reason which the jury

6   can reasonably infer from facts of type (1) or (2).  *See People v. Anderson*, 70 Cal. 2d 15,

7   26-27 (1968).  However, California courts have made it clear that these factors are not

8   required to be present in some special combination or accorded a particular weight, nor is

9   the list exhaustive.  *See People v. Steele,* 27 Cal. 4th 1230, 1249 (2002).  Rather, "[t]he

10  *Anderson* analysis was intended as a framework to assist reviewing courts in assessing

11  whether the evidence supports an inference that the killing resulted from preexisting

12  reflection and weighing of considerations."  *See Koontz*, 27 Cal. 4th at 1081.

13                          **(ii) California Court of Appeal Opinion**

14          On direct appeal, petitioner argued that the evidence did not satisfy the *Anderson*

15  framework because there was no evidence of motive, scant evidence of planning, and the

16  shooting was "not so particular and exacting that the defendant must have intentionally

17  killed according to a preconceived design to take the victim's life in a particular way." Resp.

18  Exh. B at 12.  The California Court of Appeal acknowledged that direct evidence of a

19  motive for the killing was absent, but nevertheless determined that there was sufficient

20  evidence from which a properly instructed jury could infer that "the killing occurred as the

21  result of preexisting reflection rather than unconsidered or rash impulse."  Resp. Exh. B at

22  14.  First, the court found evidence of planning because petitioner drove to San Jose from

23  Modesto with a loaded gun in his car, and admitted that his plan was to get rid of the gun or

24  to kill himself with it.  *Id.*  From this testimony, the jury could believe that Diaz had a plan,

25  but reject his explanation of it.  *Id.*  Furthermore, because petitioner admitted that he

26  retrieved the gun from his car, a rational jury could reject his claim that he didn't bring the

27  gun into the bar, and infer that he either brought it with him initially, or retrieved it from his

28  car during one of the times he left the bar with Cruz.  *Id.*  Second, despite petitioner's claim

United States District Court

For the Northern District of California

1   that he did not know Cruz, the jury could reject his testimony and reasonably infer that he

2   had some prior acquaintance with him based on witness testimony describing their

3   interaction. *Id.* From the foregoing inferences of planning and prior acquaintance, the

4   court concluded that it was reasonable for the jury to infer "that [Diaz] considered the

5   possibility of homicide from the outset." *Id.*

6         The court also emphasized the testimony of two witnesses, Flores and Olivera, as

7   the strongest evidence that petitioner acted from preexisting reflection rather than from

8   unconsidered or rash impulse. *Id.* at 15.  Flores and Olivera testified that petitioner paused

9   between shots, which allowed the jury to infer that petitioner, when faced with the choice of

10  whether to shoot to kill or to cease shooting, chose to continue shooting. *Id.* The court

11  also noted that Cruz was shot at point blank range, thereby corroborating petitioner's

12  testimony that he was so close to Cruz when he pointed the gun at his neck that he fell with

13  him when he pulled the trigger. *Id.* Witnesses also testified that Cruz pleaded for help as

14  petitioner said, "I'm gonna kill you, son of a bitch" and "there's no one here to help you,"

15  before firing the shots. *Id.* The court found that the evidence showed that petitioner chased

16  down Cruz, shot and paused, shot and paused again, before shooting Cruz in the neck at

17  point blank range while he was on his knees begging for help. *Id.*  The court reasoned that

18  a rational jury could reasonably conclude that this was a "cold-blooded execution." *Id.*  In

19  short, based on evidence from which the jury could infer that petitioner had some type of

20  prior acquaintance with Cruz, formed a plan to kill him, and facilitated the killing by

21  encouraging him to drink to excess; coupled with the evidence concerning the manner of

22  the killing, the court found sufficient evidence to support the jury's verdict of first-degree

23  murder. *Id.*

24              **(iii) Analysis**

25        In determining that the evidence was sufficient to support the first-degree murder

26  conviction, the state court relied, in varying degrees, on all three of the relevant categories

27  of evidence set forth in *Anderson*: planning, motive, and manner of killing.  Resp. Exh. D at

28  14-15.  Petitioner argues that the state court's conclusions regarding these factors were not

United States District Court
For the Northern District of California

1    based on reasonable inferences, and that the court misapplied the law relevant to

2    determining whether there was sufficient evidence to prove premeditation and deliberation.

3    Hab. Pet. Supplemental Claim ("Supp.") at 2.

4         Petitioner's argument that an application of the *Anderson* guidelines to these facts

5    does not establish premeditation and deliberation has some merit, because the only

6    witness who can provide a motive is the victim, and the only evidence of planning is that

7    petitioner kept a loaded gun in his car.  However, California courts have made it clear that

8    the *Anderson* factors are to be used only for guidance, and do not provide concrete

9    prerequisites for proving premeditation and deliberation in each and every case, nor are

10   they required to be present in some special combination or accorded a particular weight.

11   *See Mayfield*, 14 Cal. 4th at 767; *Steele,* 27 Cal. 4th at 1249.

12        Based on the evidence presented at trial, a rational trier of fact could have

13   concluded that petitioner made a cold and calculated decision to take Cruz's life after

14   consideration and weighing of his options.  The record reflects that petitioner left his house

15   in Modesto with a loaded handgun concealed under the seat and drove to San Jose.  Resp.

16   Exh. D8 at 2273.  After dropping his family off at his mother's house, he drove around San

17   Jose and ended up at Tango's Cantina, where he had been a couple of times before.  *Id.* at

18   2279.  From this evidence, a rational juror could logically infer that petitioner planned to

19   commit the killing when he kept the loaded gun concealed in his car.

20         While at the Cantina, petitioner struck up a conversation with Cruz and, according to

21   his testimony, their interaction grew tense over the evening due to Cruz's intoxication and

22   jealousy over a bartender named Mery.  *Id.* at 2198-2223.  However, according to other

23   accounts, their communication appeared to be perfectly normal.  Resp. Exh. D10 at 2730-

24   31.  The only eyewitness, Olivera, testified that he saw both men immediately before the

25   shooting and that neither appeared to be angry or hostile.  Resp. Exh. D5 at 1304-05.

26   Olivera further testified that he heard Cruz's cries for help as he was being chased by

27   petitioner, and heard petitioner respond that he was going to kill him, and that no one was

28   there to help.  *Id.* at 1313-14.  Seconds later, Olivera heard a gunshot, followed by another

United States District Court

For the Northern District of California

1   gunshot five seconds later, and then another gunshot, and saw the victim lying face up in

2   the entrance to the bar.  *Id.* at 1319-20.  At least four shots were fired, one of them at point

3   blank range into the victim's neck.  Resp. Exh. D10 at 2765.  From this evidence, a rational

4   trier of fact could infer that, based upon their prior relationship (if any), or upon whatever

5   transpired between the two men that evening, petitioner settled upon a course of action that

6   would result in the victim's death.

7          Although these events did not take place over a significant period of time, the act of

8   chasing down Cruz and pausing between gunshots as he cried out for help, is indicative of

9   a killing that resulted from cool reflection and a calculated judgment after the weighing of

10  considerations.  *See e.g. Koontz,* 27 Cal. 4th at 1080.  In other words, a rational juror could

11  reject the notion that the killing was more than just a "mere unconsidered or rash impulse

12  hastily executed."  *See Anderson*, 70 Cal. 2d at 27 (citation omitted).  These facts, coupled

13  with the particularly strong evidence regarding the manner of killing, are sufficient to

14  support a verdict of premeditated and deliberate first-degree murder.

15                   **(iv) Conclusion**

16         Viewing the evidence in the light most favorable to the prosecution, the record

17  supports the conclusion that a rational trier of fact could have found beyond a reasonable

18  doubt that petitioner committed the murder with premeditation and deliberation.  *See United*

19  *States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (2001).  The state court's determination

20  that there was sufficient evidence to support the jury's verdict of first-degree murder was

21  not contrary to, or an unreasonable application of, clearly established federal law.  *See* 28

22  U.S.C. § 2254(d)(1); *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).

23  **II.     Prosecutorial Misconduct**

24          Petitioner contends that the prosecutor committed misconduct in his closing

25  argument by misstating the law of manslaughter.  Hab. Pet. 5.

26

27         **A.  Factual Background**

28         The California Court of Appeal described the facts underlying this claim as follows:

                                                    12

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Much of the prosecutor's opening argument related to voluntary manslaughter.  No objection was interposed to any of it.  A portion of the prosecutor's rebuttal argument was also devoted to voluntary manslaughter. At the end of his remarks on this topic, the prosecutor stated:  "[V]oluntary manslaughter is going to be reserved only for those special cases where the provocation from that victim was so extreme that a person of average disposition is going to react in the same situation under the same circumstances not from judgment, but from passion, and then a ratuonal ( sic )-" Defense counsel cut the prosecutor off, objecting "to the statement of law regarding voluntary manslaughter." The court responded: "Ladies and Gentlemen, I'll instruct you on the law and you will follow my instructions.  This is argument." The prosecutor then continued: "And that is a correct statement of the law as much as [defense counsel] may not like it, but his honor will redo the instructions tomorrow and that will confirm that that is an absolute correct statement of the law.  Don't take that bait or fall for that argument that simply flipping someone off when they cut you off on the freeway is the type of provocation that the law of voluntary manslaughter addresses, and if it did, heaven help us." With those words the prosecutor ended his summation.

After the jury had been dismissed for the day, defense counsel unsuccessfully moved for a mistrial based on the prosecutor's remarks. Alternatively, he asked that the jury be admonished that "they were given an incorrect statement of the law by the prosecutor and for them to know that the instruction or the correct version of the law is in the CALJIC instruction." The court stated, "I think, that's a reasonable response ... under the circumstances."

Resp. Exh. B at 16-17, Exh. D10 at 2810-12.

On direct appeal, petitioner argued that the prosecutor's remarks misstated the law of provocation and heat of passion by allowing the jury to find that he was only entitled to a manslaughter verdict if a reasonable person would have done the same thing under similar circumstances.  Resp. Exh. B at 18.  The appellate court rejected this argument, finding that the prosecutor's statement "did not imply that voluntary manslaughter is reserved for cases in which the person of average disposition would react by killing the provocateur." *Id.* at 19.  The court concluded that it was not reasonably likely that the jury interpreted the prosecutor's remarks to mean that petitioner was not entitled to a manslaughter verdict unless it found that a reasonable person would have killed under the same circumstances. *Id.* Further, the trial court made it clear that, in the case of a conflict, the court's instructions took precedence over the parties' arguments. *Id.* Based on the record presented, the appellate court found no prosecutorial misconduct. *Id.*

1

**B. Legal Standard**

2   Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate

3   standard of review is the narrow one of due process and not the broad exercise of

4   supervisory power.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's

5   due process rights are violated when a prosecutor's misconduct renders a trial

6   fundamentally unfair.  *See Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of

7   due process analysis in cases of alleged prosecutorial misconduct is the fairness of the

8   trial, not the culpability of the prosecutor").  Claims of prosecutorial misconduct are

9   reviewed "'on the merits, examining the entire proceedings to determine whether the

10  prosecutor's remarks so infected the trial with unfairness as to make the resulting

11  conviction a denial of due process.'"  *See Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.

12  1995) (citation omitted).

13  **C. Discussion**

14  Petitioner claims that the prosecutor committed misconduct by stating that

15  manslaughter only applied in special cases where the provocation is so extreme that the

16  average person would react as he did.  Hab. Pet. Supp. at 4.  Petitioner's argument lacks

17  merit.  Under California law, "[a]n unlawful homicide is upon 'a sudden quarrel or heat of

18  passion' if the killer's reason was obscured by a 'provocation' sufficient to cause an

19  ordinary person of average disposition to act rashly and without deliberation."  *See People*

20  *v. Najera*, 138 Cal. App. 4th 212, 223 (2006) (citation omitted).  Here, the prosecutor's

21  remarks properly focused on the provocation and whether it was sufficient to cause an

22  average person to act from passion; not upon the reasonableness of petitioner's response

23  to the provocation, which is irrelevant.  *See Najera*, 138 Cal. App. 4th at 223.  Even

24  assuming that there was error, the court's opening instructions made it unlikely that the jury

25  interpreted the prosecutor's statement to preclude a verdict of manslaughter.[1]  *See Boyde*

26  _____

27  [1]The jury was given CALJIC 1.00, describing the respective duties of judge and jury.
The instruction states in part: "You must accept and follow the law as I state it to you,
28  regardless of whether you agree with it.  If anything concerning the law said by the attorneys
in their arguments or at any other time during the trial conflicts with my instructions on the law,

United States District Court
For the Northern District of California

1    *v. California*, 494 U.S. 370, 384 (1990) ("Arguments of counsel which misstate the law are

2    subject to objection and to correction by the court").  Viewed in context of the entire

3    argument and the court's instructions, the prosecutor's remarks did not result in a denial of

4    due process.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996)

5    ("[A]rguments of counsel are generally accorded less weight by the jury than the court's

6    instructions and must be judged in the context of the entire argument and the

7    instructions.").  The state court's determination that there was no prosecutorial misconduct

8    was not contrary to, or an unreasonable application of, clearly established federal law.  *See*

9    28 U.S.C. § 2254(d).

10   **III.    Instruction on Voluntary Manslaughter Based on Intoxication**

11          Petitioner contends that the trial court erred by refusing his request to instruct the

12   jury that it could consider voluntary intoxication in determining whether he actually killed in

13   the heat of passion.  Hab. Pet.  at 6.

14          **A.    Factual Background**

15          During the instruction conference, defense counsel requested that he be permitted

16   to argue that the defendant's voluntary intoxication was relevant to the subjective

17   component of voluntary manslaughter, in other words, whether he actually killed in the heat

18   of passion.  Resp. Exh. B at 19, D10 at 2708-09.  Counsel also requested that the trial

19   court modify its instructions on voluntary intoxication to allow the jury to consider the effect

20   of the defendant's intoxication on the question of whether he subjectively acted in the heat

21   of passion.  Resp. Exh. B at 19, D10 at 2710.  Both requests were denied.  *Id.*

22          The trial court instructed the jury as follows:

23

24          CALJIC 4.22

25          Intoxication of a person is voluntary if it results from the willing use of any
             intoxicating liquor, drug, or other substance, knowing that it is capable of
26           an intoxicating effect, or when he willingly assumes the risk of that effect.

27   _____

28   you must follow my instructions."  Resp. Exh. D11 at 3004.

15

Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of an intoxicating liquor, drug, or other substance.

<u>CALJIC 4.21.1</u>

It is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of that condition.

However, there is an exception to this general rule, namely, where a specific mental state is an essential element of a crime.

In that event, you should consider the defendant's voluntary intoxication in deciding whether the defendant possessed the required specific intent or mental state at the time of the commission of the alleged crime.

Thus, in the crime charged in count 1 or the lesser crime of murder in the second degree or voluntary manslaughter, a necessary element is the existence in the mind of the defendant of a certain specific intent or mental state which is included in the definition of the crime set forth elsewhere in these instructions.

If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in deciding whether or not that defendant had the required specific intent or mental state.

If from all the evidence you have a reasonable doubt whether a defendant had the required specific intent or mental state, you must find that defendant did not have that specific intent or mental state.

Resp. Exh. D11 at 3023-24.

The California Court of Appeal reasoned that, even if the trial court erred by failing to instruct the jury on voluntary manslaughter and the subjective component of heat of passion, there was no prejudice because:  (1) the jury was instructed to consider the defendant's voluntary intoxication in determining whether he possessed the required specific intent or mental state charged in count one or the lesser crime of murder in the second degree or voluntary manslaughter, and (2) the instructions provided numerous additional opportunities to resolve whether defendant actually killed in the heat of passion or whether there was a premeditated and deliberate murder.  Resp. Exh. B at 21-22.  Thus, the factual question posed by the omitted instruction was answered adversely to defendant's position under the instructions given.  *Id.* at 22.  In any event, the appellate court found that there was no evidence of provocation on the part of the victim that would have caused a "reasonable person of average disposition to act rashly and without deliberation."  *Id.*  In view of the overwhelming evidence that the homicide was murder, the

16

court found any error to be harmless because it was not reasonably probable that the jury would have returned a verdict of manslaughter absent the error. *Id.*

### B. Legal Standard

The formulation of jury instructions is a question of state law and is not cognizable in habeas proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). A faulty jury instruction will constitute a violation of due process only where the instruction by itself infects the entire trial to such an extent that the resulting conviction violates due process. *See Hendricks v. Vasquez*, 974 F.2d 1099, 1106 (9th Cir.1992) *citing Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir.1995). Where a given jury instruction is ambiguous, a reviewing court must determine whether there is a "reasonable likelihood" that the jury was misled. *See Murtishaw v. Woodford*, 255 F.3d 926, 967 (9th Cir. 2001).

The Supreme Court has held that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *See Matthews v. United States*, 485 U.S. 58, 63 (1988). The failure to provide adequate instructions on a defense theory of the case constitutes a denial of due process under the Fourteenth Amendment. *See Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002); *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir.1999). However, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *See Henderson v. Kibbe*, 431 U.S. 145,155 (1977). Thus where the alleged error is the failure to give an instruction, the habeas petitioner's burden is especially heavy. *Id.*

### C. Discussion

Petitioner maintains that the trial court erred by not instructing the jury that voluntary intoxication could be considered in determining whether he subjectively acted in the heat of passion. Hab. Pet. at 6, Traverse at 7.

Petitioner correctly states that, under California law, the heat of passion requirement for voluntary manslaughter has both an objective and a subjective component. *See People*

17

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*v. Steele*, 27 Cal. 4th 1230, 1253 (2002).  This means first, that the circumstances giving rise to the heat of passion must be such as would arouse the passion of an ordinarily reasonable person under the given facts and circumstances, and second, that the defendant actually killed under the heat of passion.  *Id.*  While petitioner's voluntary intoxication had no bearing on the objective, reasonable person, requirement for heat of passion, it was arguably relevant in determining whether he satisfied the subjective component of heat of passion.  *Id.*

Reasonable minds might differ as to whether the trial court erred under state law, however, in view of the standard for judging claims of instructional error, it is clear that the error, if any, did not infect the entire trial.  *See Hendricks*, 974 F.2d at 1106.  Here, the jury was instructed as follows:

> To reduce an unlawful killing from murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of the character and degree as naturally would excite and arouse the passion and the assailant must act under the influence of that sudden quarrel or heat of passion.
>
> The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable sober person in the same circumstances.

Resp. Exh. D11 at 3021-22.

The former paragraph allowed the jury to consider whether petitioner satisfied the subjective component for heat of passion, in other words, whether he *actually* acted under the influence of heat of passion. (emphasis added).  The court's instructions, viewed in their entirety, adequately informed the jury regarding petitioner's theory that voluntary intoxication negated the mental state required for first-degree murder, or the lesser included offenses of second-degree murder or voluntary manslaughter.  By convicting petitioner of first-degree murder rather than voluntary manslaughter, the jury determined that the killing was premeditated and deliberated, thereby rejecting the notion that he acted under the influence of heat of passion.  The instructions as given do not present a "reasonable likelihood" that the jury was misled.  *See Murtishaw*, 255 F.3d at 967.  Viewed in the context of the jury instructions and the record as a whole, the trial court's refusal to

specifically instruct the jury that voluntary intoxication could be considered in determining whether he subjectively acted in the heat of passion did not violate due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Accordingly, the state court's decision was not contrary to or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.  *See* 28 U.S.C. § 2254(d).

## IV.   Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that two issues presented by petitioner in his petition meet the above standard and accordingly GRANTS the COA as to those issues.  *See generally Miller-El*, 537 U.S. at 322.  The issues are:

(1) whether there is insufficient evidence of premeditation or deliberation to support a first-degree murder conviction; and

(2) whether the trial court erred by refusing to instruct the jury that voluntary intoxication could be considered in determining whether petitioner subjectively acted in the heat of passion.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

19

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A Certificate of Appealability is **GRANTED**.  *See* Rule11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March 26, 2013.

_____
PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.10\DIAZ5298.HC.wpd

United States District Court

For the Northern District of California